J-S01025-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| TIMOTHY ALLAN FROST | : | |
| | : | |
| Appellant | : | No. 126 WDA 2022 |

Appeal from the Judgment of Sentence Entered December 7, 2021,
in the Court of Common Pleas of Fayette County ,
Criminal Division at No(s):  CP-26-CR-0002709-2019.

BEFORE:   BENDER, P.J.E., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY KUNSELMAN, J.                    **FILED: August 30, 2023**

## I.      Introduction

Timothy Allan Frost appeals from the judgment of sentence imposing 25 to 50 years' incarceration after a jury convicted him of raping a child and various, related offenses.[1]  Among other issues, he challenges evidentiary rulings regarding a prior conviction and hearsay statements.  These issues warrant relief.  Thus, we vacate the judgment of sentence and the convictions and remand for a new trial.

## II.     Factual & Procedural Background

A lengthy recitation of the facts and procedure of this case is necessary to understand our analysis of the evidentiary issues.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] **See** 18 Pa.C.S.A. §§ 3121; 3122.1(b) (statutory sexual assault); 3124.1 (sexual assault); 3125(a)(7) (aggravated indecent assault); 6301(a)(1)(ii) (corruption of minors); and 6318(a)(1) (unlawful contact with a minor).

## A.    Family History

In the mid-1970s, the Frost family moved to Fayette County, while Mr. Frost and his brothers were middle schoolers.  They became friends with their classmate, Mary Lancaster Close.  *See* N.T., 10/6/21, at 19.  The two families would camp, hunt, and spend holidays together.  Fifteen years later, the Frosts relocated to North Carolina, and Mr. Frost joined the Navy.  Around 2015, Mr. Frost and his brother returned to Pennsylvania.  *See id.* at 20.  They worked as long-haul truck drivers, spending weekdays on the road and weekends in Fayette County.  Their friendship with Ms. Close and her now-adult daughter, Jennifer Marie Show, resumed.

Ms. Show ("mother") resided with her son, M.S. (then age ten), and her daughter, A.S. (then age six), in a rental property in Searights, Pennsylvania.  A.S. struggled in school, was "behind in a normal grade level," and had "a very low IQ."  *Id.* at 42, 44.  Mentally, she was "like a child so many years younger than her actual years."  *Id.* at 43. Ms. Close ("grandmother") resided with her husband and their twelve-year-old daughter in nearby New Salem. A.S.'s father, Steven Harbaugh ("father"), lived in the mountains, on the southeastern edge of Fayette County.  A.S. stayed at mother's house during the week but spent 90% of the weekends at father's house.  *See id.* at 23; *see also* N.T., 10/7/21, at 277.

In late 2016 or early 2017, Mr. Frost began staying at mother's house on weekends.  Sometimes Mr. Frost would take mother, M.S., and A.S. out to eat; buy them groceries; or take them to events, such as wrestling shows.

- 2 -

*See* N.T., 10/6/21, at 23-24. On Sunday evenings, he returned to the road in his truck. This arrangement continued for about two months.

Meanwhile, mother had nurtured an online relationship with Bobby Cline ("boyfriend"), a Coloradan, whom she met on Facebook in 2012. *See id.* at 49; *see also* N.T., 10/7/21, at 257. When mother and boyfriend officially became a couple, she asked Mr. Frost to take her to meet boyfriend, who was visiting his friends near Harrisburg. Mr. Frost agreed. Boyfriend then returned to Searights with them and moved into mother's rental house with M.S. and A.S. Mother and boyfriend have lived together ever since. They eventually got engaged and had a daughter of their own.

Both of them were jobless during the relevant period. After four months of mother and boyfriend cohabitating, mother failed to make rent. Facing eviction, mother, boyfriend, and Mr. Frost agreed to move into a four-bedroom home in New Salem, in July of 2017. Mr. Frost would pay the rent in exchange for mother and boyfriend purchasing the food and keeping the residence clean. *See* N.T., 10/7/21, at 303. Mother and boyfriend occupied one bedroom; Mr. Frost, M.S., and A.S. each had a separate bedroom. The bedrooms were on the second floor, along with the home's only bathroom. The kitchen and other public spaces of the house were on the first floor. The laundry facilities were in the basement.

They functioned as a family. The children called Mr. Frost "uncle." They spent holidays together and often visited grandmother's house, about a block away.

In November 2017, Mr. Frost left his long-haul job and went to work for another company driving local routes. This allowed him to be home every night for about two months. *See id.* at 305-06. The local company fired him, and he resumed his prior employment of long-haul trucking from Sundays through Fridays. *See id.* at 306.

## B.     Mr. Frost's Report of Boyfriend for Alleged Child Abuse

On Sunday, March 25, 2018, Mr. Frost left for a week of work. While in another state, he anonymously reported that boyfriend had sexually assaulted A.S. to the child-abuse hotline. The hotline agent drafted the following report based on Mr. Frost's phone call:

> [A.S.], mother, and her boyfriend live with [mother's] "Uncle," [who] said they are not related by blood. [Mother] has always known him as an uncle in her life since birth. [Mr. Frost] said he had a bad feeling since last June, but he couldn't get [A.S.] to talk until this past week. [Mr. Frost] said [A.S.] has been having "butt issues" for a while, and [mother] keeps blaming hemorrhoids . . . Last week, on Wed. 3/21/18, last incident of abuse that [A.S.] has told [Mr. Frost] about and the last time [he] is aware of. [Mr. Frost] thinks it's been going on for nine months at least. Fri. 3/23/18 and Sat. 3/24/18, [Mr. Frost] had chance to talk with [A.S.] and spend time with her. [A.S.] told [Mr. Frost,] "He put his wiener inside my butt." "He put his yucky stuff inside me." [Mr. Frost] asked [A.S.] to "look at her butt to see how red it is," and [Mr. Frost] alleges you can see fingerprints back by anal area of [A.S.] "You can see his thumbprints from where he spread her butt cheeks," per [Mr. Frost,] referring to [boyfriend. Mr. Frost] studied [A.S.] for past few months and could tell something was wrong. [Mr. Frost] questioned [A.S.] at length and in detail about abuse. "My gut feeling is she knows something is going on; I don't think she knows he penetrated her butt. I think she knows he has fingered her and played with her vagina. It's a strong gut feeling. She needs to be back in a hospital on

her meds, and [boyfriend] needs to be locked up somewhere," per [Mr. Frost].

* * *

[There are an] eleven-year-old boy and six-year-old girl[ in the home. The boy, M.S., is] diagnosed with ADHD . . . [and] prescribed Adderall. [Mr. Frost] feels very strongly that [A.S.] needs to be checked/rape kit.

"Uncle" is a truck driver and gone a lot . . . [mother] and boyfriend are smoking [cannabis.] "They get [A.S.] high, and they think it's funny!" [Mr. Frost] reports he has seen, on more than one occasion, [mother] inhale smoke and blow it into [A.S.'s] face; [mother] picks child up or calls her over while they are smoking. [Mother] sells [M.S.'s] pills to be able to buy weed. [Mother] and boyfriend do not work. [A.S.'s father] has a job, doesn't do drugs, is a good father, [A.S.] enjoys her time there, per [Mr. Frost. Mother] is supposed to be on medication for mental health issues and hasn't been on them for three years, per [Mr. Frost]. Basic needs not met - [mother] is allegedly taking child's meds and selling it for money for [cannabis].

Commonwealth's Ex. 11 at 2.

The hotline forwarded Mr. Frost's report to Children and Youth Services ("CYS") and the Pennsylvania State Police ("PSP"). In response, two state troopers, PSP Corporal George Mrosko, and two CYS workers went to the family's home in New Salem to investigate at 11:40 p.m. on Tuesday, March 27, 2018. Mother and boyfriend were home, but Mr. Frost was not. A.S. and M.S. were asleep when the CYS workers first met them.

Examining A.S., CYS discovered "redness on her buttocks. It looked irritated, so she needed to go to the hospital." N.T., 10/7/21, at 215. This prompted CYS to remove the children from mother's house and place them

with grandmother. *See id.* Upon passing drug screening and various background checks, grandmother and her husband accepted custody of M.S. and A.S. The troopers arrested boyfriend and took him to the PSP barracks. *See id.* at 263.

Next, in the wee hours of March 28, Corporal Mrosko and grandmother drove A.S. to Uniontown Hospital. According to grandmother, the doctor there "seemed to think that [A.S.] had just been molested," and that it was "not something that may have been over time." N.T., 10/6/21, at 37. However, Corporal Mrosko recalled the doctor reporting "no obvious signs of trauma, but there were signs of irritation on the buttocks." N.T., 10/7/21, at 227. Ultimately, the Uniontown medical staff could not do "a forensic examination for pediatrics, and [A.S. had] to be transferred to Children's" Hospital in Pittsburgh. *Id.* at 216.

Grandmother accompanied A.S. to Pittsburgh, while Corporal Mrosko returned to the PSP barracks. There, he interviewed boyfriend concerning the allegations in Mr. Frost's child-abuse report. Afterwards, the PSP released boyfriend without charging him. *See id.* at 222.

At Children's Hospital, around 10:00 a.m., Forensic Nurse Debra Shane conducted a forensic examination of A.S. with the aid of a nurse practitioner. Before beginning an exam, forensic nurses typically do not interview a child victim about the underlying crimes. *See id.* at 150. Their role "is more of a medical perspective to find out what medically is wrong with [the child, are] there any injuries, and to collect evidence." *Id.* Instead of questioning the

- 6 -

child, they "try to get a history from the adults that are bringing the child into [the hospital]." *Id.*

In this case, Nurse Shane recorded the prior history on UPMC's "Sexual Assault Evidence Collection" form that she completed as part of A.S.'s exam. According to that report, "when asked by CYS, police, and Uniontown E.D./M.D., [A.S. said] that 'Bobbie' [*i.e.*, boyfriend] put his wiener in her butt, and that he had been in her bed with her and pushed his wiener against her. Upon being asked by the same people, she stated this happens every day." Commonwealth's Ex. 4 at 2.

The nurses visually examined A.S. under a magnifying lens. They found A.S.'s labia were adhered together, which completely obstructed their view of her hymen. N.T., 10/7/21, at 144-45. The nurses did not probe, "because that is painful" for a child who has not yet menstruated. *Id.* at 140. As for A.S.'s anus, the nurses discovered a "2 cm, tear (superficial)" near her "anal folds,"[2] which was outside the rectum. Commonwealth's Ex. 4 at 6; *see also* N.T., 10/7/21, at 157. Nurse Shane documented the above findings on

_____

[2] The stenographer seemingly erred when recording Nurse Shane's testimony. According to the trial transcript, the nurses found "a little tear, superficial, down . . . by her anal *phobes*." N.T., 10/7/21, at 145 (emphasis added). However, Nurse Shane wrote "anal folds" on the "Sexual Assault Evidence Collection" form to describe the location of the tear. Commonwealth's Ex. 4 at 6 "Anal *phobes*" are not part of the human body; anal *folds* are. *See*, *e.g.*, The Cleveland Clinic Online, "Anus: Anatomy," available at https://my.clevelandclinic.org/health/body/24784-anus-function (last visited 6/25/23). Thus, we accept Nurse Shane's contemporaneous notes as the accurate record of her examination results, rather than the nonsensical word "anal phobes" that appears in the transcript. N.T., 10/7/21, at 145.

UMPC's "Sexual Assault Evidence Collection" form, because they were not completely normal. ***See id.*** at 145. Still, none of them proved that a sexual assault had occurred. ***See id.*** at 157.

The nurses also collected cotton swabs from around A.S.'s genitalia and her anus to form a rape kit. ***See*** Commonwealth's Ex. 4 at 8; ***see also*** N.T., 10/7/21, at 146-48. Additionally, they bagged the girl's underwear. ***See id.*** at 148-49. The collected evidence went to a forensic laboratory for testing, but the swabs and underwear were dead ends. They contained no male DNA or reproductive fluid. ***See id.*** at 161-82.

**C.     Brittany Locke's Interviews of Both Children**

**1.     Interview of A.S.**

At the request of CYS and the PSP, on April 11, 2018, Brittany Locke from A Child's Place conducted a forensic interview of A.S, based on special training to talk "with kids using more open-ended questions, pulling from their free recall, memory, and bringing a narrative out of the experience." ***Id.*** at 233. When an initial report of child abuse arises, forensic interviewers attempt to schedule the child "as soon as possible," because they "want to try to get them in, so that outside influences or factors may not be an issue." ***Id.*** at 236. Law enforcement and CYS typically observe the interview through a two-way mirror and video record it; Corporal Mrosko and Ms. Locke did so in this

case. *See id.* at 235-37. The recording became Commonwealth's Ex. 1 at trial.[3]

After explaining the family's living situation to Ms. Locke, A.S. told the interviewer that she could not tell the truth about what happened to her, because she did not "want to tell anybody about that." Commonwealth's Ex. 1, VTS_01_1, at 1:19-4:59. Ms. Locke struggled to get A.S. to discuss the allegations of sexual assault, and A.S. initially denied that anyone had touched her inappropriately. *See id.* at 10:21-11:31. Ms. Locke pressed the issue, and A.S. eventually said, "Yeah, [boyfriend]." *Id.* at 12:09-12:10. When asked what boyfriend touched her buttocks with, A.S. repeatedly whispered, "His wiener." *Id.* at 12:40, 12:43, 12:45, 12:54.

When asked to explain the incident, A.S. said, "I was in my room sleeping." *Id.* at 13:10. She then looked back at Ms. Locke, kept eye contact, continued by demonstrating someone walking slowly with her fingers on the

_____

[3] As in Note 2, *supra*, our review of the record reveals several discrepancies between the trial transcript and the video exhibit. For example, throughout the playing of Commonwealth's Ex. 1 at trial, the stenographer struggled to discern the audio and often recorded it as "inaudible." *See* N.T., 10/7/21, at 34-63. This is understandable, given that A.S.'s speech pattern is often garbled, grammatically flawed, or nonresponsive to the question. This Court often had to play and replay the video to determine what A.S. said. And there are instances, even after multiple replays, where we still could not decern the speaker's words. We also discovered instances where the stenographer's transcription does not match the dialogue in the video. Also, the stenographer did not have time to record the events and body language that the video indisputably captured. Therefore, we take our facts of what occurred at the April 11, 2018 forensic interview from the indisputable video evidence in Commonwealth's Ex. 1, rather than the incomplete and, at times, inaccurate trial transcript.

tabletop, and said, "He - - he tip-toed into my room, and he pulled my pants, and he stuck his wiener in my - - pee spot." *Id.* at 13:10-13:20.

"In your pee spot. And then what happened?" Ms. Locke asked. *Id.* at 13:21-13:23.

While still maintaining eye contact, A.S. slowly walked her fingers in the other direction and said, "He tip-toed out of my room again." *Id.* at 13:25-13:27. When asked if anyone witnessed this event, A.S. said, "My uncle [*i.e.,* Mr. Frost]." *Id.* at 15:14-15:15.

Ms. Locke gave A.S. a male and female doll to reenact the event. A.S. laid the girl doll down on the tabletop, as if in bed. She then slowly walked the boy doll from the right side of the table toward the prone girl doll. As she did this, A.S. said, "And [boyfriend] did this: tiptoe, tiptoe, tiptoe, tiptoe, and he pulled his pants down, and he pulled my pants down, and did this." *Id.* at 19:11-19:23. A.S. placed the boy doll on top of the girl doll, in a missionary position, and wiggled the boy doll up and down. *See id.* at 19:24-19:25. A.S. continued, "And I didn't even feel it, and he pulled his pants back up. And he sneaked out of my room." *Id.* at 19:26-19:32. She walked the boy doll back to the right and said, "And [Mr. Frost] went back in his room, and he told me when I woke up." *Id.* at 19:33-19:38. She stood the girl doll up and made a yawning sound.

Ms. Locke inquired as to Mr. Frost's role in the incident. A.S. said that he uses his phone to video boyfriend molesting her and that Mr. Frost told her what boyfriend had done to her. A.S. explained that she did not recall

anything of the event, because she was sleeping and did not see anyone come into her room on the night in question.

**2.** **Interview of M.S.**

Nine days later, on April 20, 2018, Ms. Locke interviewed M.S. to inquire into whether boyfriend had also sexually assaulted him. Ms. Locke prepared a report of the interview. **See** Commonwealth's Ex. 12. Two CYS Workers, Ashley Lee and Jennifer Polando, observed M.S.'s interview. **See id.** at 1.

Ms. Locke's report recorded that:

> **MENTAL STATUS:**
>
> [M.S.] presented as a friendly, talkative, eleven-year-old male. There were no signs of delays or limitations. [He] maintained his attention and conversed appropriately. His narratives and details appeared to be spontaneous.
>
> **SUMMARY OF INTERVIEW:**
>
> ***The interview was recorded. Please refer to the DVD as this is a summary.***[4]
>
> [M.S.] talked about school and what he likes to do for fun. [He] gave demographic information regarding his family. This clinician explained the rules of the interview to [M.S.] and explained the importance of telling the truth during the interview, to which [M.S.] agreed.
>
> \*　　\*　　\*
>
> [M.S.] told this clinician that [boyfriend] goes in the basement when [A.S.] is down there and puts a towel on the dryer. [M.S.] said that he put cameras around the house. The cameras are connected to his phone. When asked how [M.S.] got the cameras, he said they were

---

[4] Unlike the forensic interviews of A.S., the video recording of M.S.'s forensic interview is not in the certified record.

custom made. [His] friends gave him camera parts, and [M.S.] made them. When asked what made him want to put up cameras, [M.S.] said that he wanted to keep an eye on his sister. [M.S.] explained he wants to keep her safe, and if anyone goes in there, [he] is afraid of them doing bad stuff. When asked if something happened that [M.S.] wanted to keep an eye on her, [M.S.] mentioned [A.S.'s] dad's brother, Richie, comes to the house and he wants to keep an eye on her. [M.S.] said that he was ten when [boyfriend] put the cameras up, and they are still up. He said that his phone puts the videos on storage and keeps it until he deletes it. He also said that the cameras are always running.

When asked about likes and dislikes of [mother], [boyfriend], and [Mr. Frost], [M.S.] explained that [Mr. Frost] is "extra, extra nice" to [A.S.] He explained that [Mr. Frost] takes care of [A.S.] on the weekend. If she is in a bad mood, he allows [A.S.] to sit on his lap and "bumps" her up and down. When asked what he doesn't like about [Mr. Frost], [M.S.] said, "That he babies [A.S.]" He explained that he treats [A.S.] like she is his. [M.S.] also mentioned that [Mr. Frost] is always loving to [A.S.], such as if [A.S.] asks for his phone, he gives it to her.

In a sexual-abuse screening, [M.S.] named his "bad spot and butt" as places on his body where no one should touch. [M.S.] denied anyone looking at or touching those places, but he stated that he and [boyfriend] take a shower together. He denied anything happening while in the shower that made him feel uncomfortable. [M.S.] denied seeing someone touch someone else's bad spot and butt.

*Id.* at 1-2 (emphasis in original).

On the same day that Ms. Locke interviewed M.S., Corporal Mrosko transferred from the Criminal Investigations Unit to the Warrant Service Unit. *See* N.T., 10/7/21, at 224. Trooper Jessica Zangla became the lead investigator, and Sergeant Heather Clem-Johnston, an expert in child-sexual-assault matters, supervised and assisted her.

**D.   CYS's Report of Mr. Frost & Mother for Child Abuse**

On May 3, 2018, CYS called Sergeant Clem-Johnston to inform her that there would be a new child-abuse-hotline report regarding A.S.  CYS Worker Lee filed it based on her investigation into the family.  She named Mr. Frost and mother as the Alleged Perpetrators #1 and #2, respectively.  ***See*** Commonwealth's Ex. 13 at 1.

According to CYS Worker Lee's "Report of Suspected Child Abuse to Law Enforcement Official":

> . . . Agency became involved on 3/27/18 due to allegations of sexual abuse occurring in the home.  Upon responding to the residence, it was found that mother and children are residing with a Tier III sex offender named Timothy Frost.  Mother had knowledge that [Mr. Frost] was a sex offender prior to moving him into the home with the children.  [Mr. Frost] also has knowledge that he is a Tier III sex offender but still moved into the home with mother and children. **This referral will be a Child Protective Services (CPS) for Omission Engaging in *Per Se* Acts Leaving Child Unsupervised with a Tier II or Tier III Offender and Creating Likelihood of Sexual Abuse/Exploitation of Child Through Any Recent Act or Failure to Act.**

***Id.*** at 2.  Notably, CYS did not report that Mr. Frost abused A.S. or that A.S. had made any accusations of physical abuse against Mr. Frost.

After speaking with CYS, Sergeant Clem-Johnston reread Corporal Mrosko's file and notes.  Now aware of Mr. Frost's prior conviction, Sergent Clem-Johnston inferred new meaning from his March 2018 child-abuse-hotline report.  ***See*** N.T., 10/8/21, at 104.  "The wording of what was done with the child, what was said with the child," raised concerns for Sergeant Clem-

Johnston that there was "grooming" occurring. *Id.* at 105. She suspected Mr. Frost of grooming A.S., because his hotline report included a sentence that he "studied [her] for past few months and could tell something was wrong." Commonwealth's Ex. 11 at 2. Given "the word studied, to [her,] he [was] studying the child." N.T., 10/8/21, at 109.

Additionally, when A.S. told Mr. Frost "'[boyfriend] put his wiener inside her butt'; 'He put his yucky stuff inside me,'" Mr. Frost "asked [A.S.] to 'look at her butt to see how red it is' and . . . 'you can see [boyfriend's] thumbprints from where he spread her butt cheeks.'" *Id.* at 110 (reading Commonwealth's Ex. 11 at 2). This sentence "stuck out to [the expert,] because it inferred to [her] that Frost viewed [A.S.'s] buttocks area." *Id.* Also, Mr. Frost did not "think [A.S.] knows [boyfriend] penetrated her butt," he thought "she knows he fingered her." *Id.* at 111. This made Sergeant Clem-Johnston wonder "how is he getting that information, and why does he think that." *Id.*

Next, she watched the video of Ms. Locke interviewing A.S. **See** Commonwealth's Ex. 1, *supra*. The expert "immediately became concerned" with A.S.'s statements that Mr. Frost "told her [boyfriend] did that to her and [Mr. Frost] videotaped it." N.T., 10/8/21, at 111. This created the possibility of "child pornography going on." *Id.* at 112. Moreover, in the expert's view, it was odd that A.S. said, "well, [Mr. Frost] told me this happened. She [was] not telling [Ms. Locke] what actually happened to her that she knows. This is coming from somebody else that she is disclosing." *Id.*

Sergeant Clem-Johnston sought a search warrant for Mr. Frost's phone to look for the video A.S. claimed he recorded. However, "there was too long of a lapse of time" between A.S.'s interview and the warrant application, and the warrant did not issue. *Id.* at 113.

The PSP decided to reinterview everyone, starting with boyfriend on May 16, 2018. Trooper Zangla questioned him at the PSP barracks and decided not to charge him. Investigators then reinterviewed grandmother and mother on June 4, 2018.

A few weeks after that, on June 19, 2018, Sergeant Clem-Johnston and Trooper Zangla interviewed A.S. This was their first opportunity to sit down with her for any real length of time. After introductory drawings by A.S., they showed her anatomically correct figures of a girl and a boy. *See* Commonwealth's Ex. 3.[5] Sergeant Clem-Johnston pointed to various body parts and asked A.S. to name them. When the sergeant pointed to the male genitalia, A.S. "stated it looks like [boyfriend]." N.T., 10/8/21, at 120.

Then she asked A.S. "if something ever happened to her buttocks . . . And [A.S.] said [boyfriend] pulled his pants down and stuck this, and she

_____

[5] According to the discussion of this exhibit at trial, it should be three pages in length. *See* N.T., 10/8/21, at 118-19. However, the copy that the Commonwealth provided in a supplemental certified record is only one page; it is a figure of nude girl, showing her front and back sides. The Commonwealth has informed this Court that the Ex. 3 in the supplemental certified record is "A copy of the drawing shown to [A.S.] at trial. Note that, during trial, she was asked to make markings on this drawing. That is not shown on this copy being submitted, as it [*i.e.*, the original trial exhibit] cannot be located." Letter to Superior Court Prothonotary from Office of the District Attorney of Fayette County, May 17, 2023, at 1.

pointed to the male penis on the drawing, and put it here, and she pointed to the buttocks on the girl drawing." *Id.* at 120-21. Sergeant Clem-Johnston "asked her how she knew that. And she said [Mr. Frost] told me that he saw [boyfriend] do that. [Mr. Frost] watched it and recorded it on his phone." *Id.* at 121.

Next, the sergeant "asked her if [boyfriend] ever gave her baths, and she said, 'He never gives me baths.'' *Id.* When asked if Mr. Frost ever gave her baths, she said, "'Yes, he let's me shower with him to get the fleas off of him.'" *Id.* A.S. told the investigators that Mr. Frost's clothes were off for the shower and he "helped wash her back, her buttocks, legs, chest, and knees, and she left out the vaginal area. She did state that, 'He cleaned my whole body, except this part,' and pointed to the vaginal area on the drawing." *Id.*

When asked if she ever saw Mr. Frost's penis while in the shower, A.S. said, "'Umm, no." *Id.* She then said, "'[Boyfriend] stuck his,' she pointed to the penis on the drawing, 'in here,' and pointed to the vaginal area of the girl drawing." *Id.* at 123. Sergeant Clem-Johnston then asked her if she saw that; A.S. said, "'No, no, no. [Mr. Frost] recorded it; I didn't feel it go in.'" *Id.* A.S. "also said spontaneously, '[Mr. Frost] puts lotion on him; he puts lotion on me. And then [A.S.] pointed to the whole back side of the girl drawing as to where [Mr. Frost] puts lotion." *Id.*

Finally, Sergeant Clem-Johnston inquired about whether A.S. and Mr. Frost had secrets. A.S. said, "Uh, no. [I] never had any secrets yet. [Mr. Frost] will cry if [I] tell people about [boyfriend] stick this;" [A.S.] pointed to

the drawing of a penis, said, "into," and then pointed to the drawing of a vagina. *Id.* She also said, "[Mr. Frost] would cry . . . because he doesn't want to me to tell, and cried to me when I was in bed." *Id.*

Shortly after interviewing A.S., Sergeant Clem-Johnston transferred to internal affairs and took no further role in this investigation.

**E.    Paige Winter's Report of Mr. Frost for Child Abuse**

The following September, A.S. showed behavioral issues and emotional distress in school. Administrators arranged for her to see Paige Winters, an in-school therapist. They met weekly.

Seven months after A.S.'s initial interview by Ms. Locke, on November 30, 2018, A.S. met with Ms. Winters. The meeting began with "a normal conversation." N.T., 10/7/21, at 188. By its end, however, A.S. made various accusations that prompted Ms. Winters to submit an online, child-sex-abuse report. Ms. Winters wrote:

> [A.S.] attended individual therapy services today in school. During this time, [we] discussed about seeing her mom and how her mom had been doing. [A.S.] reported that her mom "is doing good. But I can't go over there, because [boyfriend] lives there." When asked why she is not allowed around [boyfriend, A.S.] stated, "They think he did it, but it wasn't [boyfriend,] it was [Mr. Frost]." Therapist asked [A.S.] what [Mr. Frost] had done. She said he "does bad things to kids." When asked what bad things [Mr. Frost] does, she reported "like smacking butts and stuff." Therapist asked if [Mr. Frost] had done this to [A.S.] and she said yes. She then stated, "and he put his wiener in there," while pointing toward her genital area. [A.S.] stated "he did it while I was sleeping, he pulled my pants down and put his wiener in there."

> Therapist asked if she was hurt or told anyone that this happened. [A.S.] stated "it's just really hard to tell people about this." While speaking about this, [A.S.] was visibly nervous and asked multiple times to keep the door shut, so that no one would hear what she was talking about. This event had happened while living with her mother and [boyfriend], who had been renting from [Mr. Frost's] family. [Mr. Frost] had been a family friend.
>
> [A.S.] reported that she worries about "getting him in trouble because it will make him sad." She explained that when she made [Mr. Frost] upset, he would cry a lot.

Commonwealth's Ex. 10 at 2.

In light of this third report, Trooper Zangla arranged for another forensic interview of A.S. on April 23, 2019, nearly five months after Ms. Winters' report and over a year after Ms. Locke first interviewed A.S.

### F.   Sarah Guzeman's Interview of A.S.

Sarah Guzeman questioned A.S. at Mercy Hospital in Pittsburgh. She videoed the interview, while Troopers Zangla and Kristen Zelechowski observed them through a two-way mirror. **See** N.T., 10/7/21, at 244; N.T., 10/8/21, at 29; **see also** Commonwealth's Ex. 2. The interview room and initial discussion were like Ms. Locke's interview. **See** Commonwealth's Ex. 2, VTS_01_1, at 0:01-4:59.[6] As before, A.S. was initially reluctant to discuss events surrounding this case, and she often attempted to deflect or ignore Ms. Guzeman's questions. **See id.** at 8:02-9:41.

---

[6] We take our facts of April 23, 2019 from the indisputable video evidence found in Commonwealth's Ex. 2, because the stenographer's transcription of the video is incomplete and, at times, incorrect. **See** N.T., 10/7/21, at 64-103.

A.S. eventually said that she was afraid of Mr. Frost  ***See id.*** at 9:42-9:45.  When asked why she was afraid of him, A.S. looked at Ms. Guzeman, shook her head from side to side, and said, "He was supposed to be my uncle and not do bad stuff." ***Id.*** at 9:46-9:50.  A.S. said he did bad stuff to her. ***See id.*** at 9:58.

Ms. Guzeman told A.S. to describe the bad stuff.  A.S. rested her head on her left fist; whispered, "Umm, [Mr. Frost] stuck his wiener into my pee-pee open;" looked up into Ms. Guzeman's eyes; covered her mouth with her right hand; and continued to whisper; "umm, feel bad.  I know this." ***Id.*** at 10:11-10:16.  She added, "Yeah, it hurts." ***Id.*** at 10:19.

"And it what?  It hurts?" Ms. Guzeman asked. ***Id.*** at 10:20.

A.S. then changed her mind and said, "No," and shook her head from side to side; "It just feels weird." ***Id.*** at 10:21-10:23.

"Oh, it feels weird?" Ms. Guzeman asked. ***Id.*** at 10:24.

A.S. then looked down at the box of crayons and said, "I didn't know when I was sleeping." ***Id.*** at 10:24-10:25.

"Okay, so, you said, 'He stuck his wiener into your pee-pee," Ms. Guzeman said as she wrote a note upon her form. ***Id.*** at 10:26-10:30.

A.S. again changed her story and murmured, "No." ***Id.*** at 10:31.

When asked for more details, A.S. eventually said, "Umm, [Mr. Frost] put his pee - - umm, his wiener in my pee hole by accident, and he didn't know." ***Id.*** at 12:29-12:37.

Ms. Guzeman asked, "What do you mean, 'by accident?'" ***Id.*** at 12:45-12:48.

A.S. took a deep breath; kept her eyes down; and said, "I didn't know he did it." ***Id.*** at 12:49-15:51.

"Who said it was an accident?" ***Id.*** at 15:52-15:57.

Looking directly into Ms. Guzeman's eyes, A.S. said, "No one." ***Id.*** at 12:58.

"Well, 36

what makes you think it was an accident?" ***Id.*** at 12:59-13:00.

"Mm-hmm." ***Id.*** at 13:01.

When asked what Mr. Frost does with his penis, A.S. said he cleans it out. A.S. made a masturbatory gesture and said, "Stuff comes out. It's yucky stuff." ***Id.*** at 13:57-13:59. However, when asked if she actually saw the "yucky stuff," A.S. said, "No. I was sleeping; my eyes were closed." ***Id.*** at 14:02-14:05.

Ms. Guzeman asked, "So, how do you know that stuff comes out of it?" ***Id.*** at 14:05-14:06.

A.S. looked down and, after a few seconds, she said, "I - - don't know." ***Id.*** at 14:12. A.S. insisted that, when Mr. Frost came into her room and molested her she, "was ***already*** asleep." ***Id.*** at 16:27-16:29 (emphasis in original).

Ms. Guzeman looked at A.S. with bewilderment and asked, "Well, if you were already sleep, how do you know that [Mr. Frost] put his wiener in you pee-pee hole?" *Id.* at 16:30-16:34.

"I just didn't feel it," A.S. said and looked at the camera to the left. *Id.* at 16:35-16:36.

"What did that feel like?" *Id.* at 16:37-16:40.

A.S. said, "Still weird." *Id.* at 16:43.

"Weird. Did he say anything to you when he was doing this?" *Id.* at 16:44-16:47.

A.S. continued to look at her Play-Doh and said, "He told me, 'Don't tell anyone, until' - - if he'd cry - - and he'll cry." *Id.* at 16:48-16:51.

"He said, 'Don't tell anyone, and' what?'" *Id.* at 16:52-16:56.

"He'll cry." *Id.* at 16:58.

"He'll cry, okay." *Id.* at 16:59.

A.S. looked up and said, "Yeah, he's back in jail."[7] *Id.* at 17:00-17:01.

Ms. Guzeman eventually asked, "So, he put his wiener in your pee-pee hole, and he told you not to tell anyone or he would cry. What happened after he put his wiener in your pee-pee hole?" *Id.* at 17:40-17:54.

A.S. looked up at Ms. Guzeman and said in a questioning tone, "Probably pulled up his pants and pull up my pants?" *Id.* at 17:55-17:58.

---

[7] The record does not reflect that Mr. Frost was in jail at this time.

- 21 -

Ms. Guzeman said, "And yours?  How did your pants get down in the first place?"  *Id.* at 18:14-18:15.

A.S. then departed from her most recent version of events and re-implicated boyfriend.  She said, "[Boyfriend] just - - he pulled it down."  *Id.* at 18:16.  She then went on to say that Mr. Frost had her put lotion on his penis.  *See id.* at 19:10-19:27.

Ms. Guzeman asked if anyone saw Mr. Frost molest her.  A.S. murmured, "I, umm - - no."  *Id.* at 20:09-20:13.  Next, Ms. Guzeman had A.S. draw a picture of a penis.  A.S. then repeated that "yucky stuff" would come out of it.

Ms. Guzeman asked, "Where did the yucky stuff go?"  *Id.* at 22:11-22:12.

This time, A.S. said, "In my pee-pee hole."  *Id.* at 22:13-22:15.

"In your pee-pee hole?"  *Id.* at 22:16-22:17.

"Yeah."  *Id.* at 22:17.

"What color was the yucky stuff?"  *Id.* at 22:18-22:19.

A.S. looked up from her drawing at Ms. Guzeman and said, "Umm, white.  Says white."  *Id.* at 22:20-22:23.

"How did it get in your pee-pee hole?"  *Id.* at 22:26-22:27.

A.S. looked up from her sketching again, starred at Ms. Guzeman for a couple of seconds without responding, brushed her hair back, looked back down and resumed drawing.  She then hesitantly said, "Ah, he just put the yucky stuff in it."  *Id.* at 22:27-22:33.

"How did he put the yucky stuff in it?" *Id.* at 22:36-22:37.

A.S. looked away from Ms. Guzeman. She thought for a long time; sighed twice; and said, "I don't know." *Id.* at 22:38-22:44.

Ms. Guzeman eventually asked, "Did you ever go any places with [Mr. Frost]?" *Id.* at 27:01-27:04. A.S. said no.

"Okay, did you go somewhere in his truck?" *Id.* at 27:20-27:22.

A.S. replied, "Yeah, up to mountains." *Id.* at 27:23-27:24.

"So, tell me about going in his truck up the mountains," Ms. Guzeman said. *Id.* at 27:28-27:29. A.S. explained that during the trip, Mr. Frost took her someplace to take a shower. *See id.* at 28:14-28:19.

"Well, where were you?" Ms. Guzeman asked. *Id.* at 28:26-28:27.

A.S. thought for a while; said, "Umm," looked to her left; and then stated, "It was different place, like a store." *Id.* at 28:29-28:33.

"A store? Did you see any signs when you were there?" *Id.* at 28:34-28:36.

"No." *Id.* at 28:37.

"Okay. And - - did he tell you where you were at that time?" *Id.* at 28:38-28:45.

"No." *Id.* at 28:46.

"Hmm, okay. So, tell me about him taking you to take the shower. What happened in the shower?" *Id.* at 28:47-28:49.

A.S. said, "I was helping him cleaning him." Commonwealth's Ex. 2, VTS_01_2, at 29:04-29:05.

"What were you cleaning?" *Id.* at 29:06-29:07.

"His, umm, butt and wiener," A.S. said. *Id.* at 29:08-29:10.

"So, how would you clean his butt and wiener?" Ms. Guzeman asked. *Id.* at 29:13-29:15.

A.S. said, "He told me. He just told me." *Id.* at 29:16-29:22.

At the end of the interview, Ms. Guzeman asked, "did anyone talk to you about what to say when you were gonna come see me?" *Id.* at 37:57-38:02.

A.S. hesitated for a few moments, looked up to the right, and said, "Umm - - don't know." *Id.* at 38:03-38:07.

"You don't know? Well, why did you think you were coming here, today?" *Id.* at 38:08-38:10.

A.S. smiled broadly, looked up at Ms. Guzeman, and said, "I didn't think about that." *Id.* at 38:11-38:13.

"You didn't think about that? Hmm, is there anything you and I are not supposed to be talking about?" Ms. Guzeman asked. *Id.* at 38:14-38:19.

A.S. kept her gaze down at her thumbs and, in a raspy voice, said, "I don't know." *Id.* at 38:20. Ms. Guzeman then ended the interview.

**G.    Criminal Charges against Mr. Frost**

Four months later, on August 28, 2019, Trooper Zangla charged Mr. Frost with two counts of Rape of a Child; two counts of Statutory, Sexual Assault; two counts of Unlawful Contact with a Minor; Aggravated, Indecent Assault; two counts of Corruption of Minors; two counts of Indecent Assault; and two counts of Sexual Assault. She called Mr. Frost to inform him of the

charges, A.S.'s allegations against him, and that she had a warrant for his arrest. He said, "Whatever," and hung up the phone. N.T., 10/8/21, at 31.

Three weeks later, Mr. Frost came to the PSP barracks in Uniontown to turn himself into police. They arrested and searched him. After signing a waiver of his right to remain silent,[8] Mr. Frost agreed to be interviewed. Trooper Zangla recorded it. *See* Commonwealth's Ex. 15. Mr. Frost continually denied the accusations and eventually demanded to meet with an attorney. The interview immediately concluded.

## H. The Trial of Mr. Frost

Following many continuances, the court set Monday, October 6, 2021, for a jury trial. On the Friday before trial, the Commonwealth served Mr. Frost with a Supplemental Answer to Request for Discovery, regarding the record of his 2001 guilty plea in South Carolina to Lewd Act upon a Child.

Mr. Frost filed a motion *in limine* to bar the use of and any reference to that prior conviction. Mr. Frost also asked the trial court to prohibit the Commonwealth from informing the jury that, as a result of his 2001 guilty plea, he was a Tier III registered sexual offender. Relying upon Pennsylvania Rule of Evidence 404(b)(1), he argued that his prior conviction could not be used to prove his "character in order to show that on a particular occasion [he] acted in accordance with the character." Frost's Motion *in Limine* at 2 (quoting Pa.R.E. 404(b)(1)). Further, Mr. Frost claimed the South Carolina

---

[8] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

record contained no "specific factual circumstances surrounding the prior conviction, and thus [his] prior conviction in 2001 has no relevance whatsoever to the allegations raised in this case." *Id.*

After oral argument on the motion, the trial court ruled from the bench and articulated its reasoning as follows:

> since [Mr. Frost] will be claiming that he did not commit this offense, [his prior conviction is] admissible for purposes of identity under the Rule. And I will allow it as rebuttal evidence, if and when [Mr. Frost] claims that he did not commit this offense that it would be admissible for purposes of identity under the Rule. . . .
>
> Under sexual offenses under the Rule, both the remoteness and the similarity of the other acts may affect the admissibility of the evidence. In this case, we have a prior seven-year-old child. This child at issue is six years old. There is a vaginal touching or lewd act upon a child . . . and it is alleged that [Mr. Frost] did fondle the vaginal area of that child. This incident occurred in York County, South Carolina, wherein he pled guilty. So, we have similar acts, but those are not the only factors. Because other-acts evidence has been admitted even though the other acts were different in character from the charged sexual offense. Evidence of similar acts has also been admitted, even though quite remote form the charge offense. And that is *Commonwealth v. Rodriquez* and also *Commonwealth v. Shribal*.
>
> So, therefore . . . the motion *in limine* is denied. The testimony of the prior conviction may come in in regard to the identity of [Mr. Frost].

*Id.* at 14-16.

Grandmother testified first. She provided the background of her family's relationship with Mr. Frost, as well as the story of how he rented a home for himself, mother, boyfriend, A.S., and M.S. Grandmother explained that CYS

transferred custody of A.S. and M.S. to her, following the March 27, 2018 home investigation. *See id.* at 17-29.

Grandmother also testified that, in November 2017, Mr. Frost got drunk and walked to her house from their nearby house in New Salem. Grandmother said that he asked her to buy a pregnancy test for A.S.; he thought A.S. was "getting a little thick around the middle." *Id.* at 31. According to grandmother, Mr. Frost planned to administer the test himself, because he had EMT training, and he had learned "how to talk to kids to get them to trust you." *Id.* For example, "you could call a man's private parts a wiener, something that the kids are going to relate to." *Id.*

Grandmother said Mr. Frost told her, "I have been reading up and I have been looking at things, and six-year-olds can get pregnant." *Id.* at 30. When grandmother asked him why he thought A.S. was pregnant, Mr. Frost said, "I am not sure about some of the goings-on . . . at the house." *Id.* at 31. Then grandmother stated that this discussion started "bells and whistles . . . going off and red flags" for her. *Id.* at 32.

Despite those bells, whistles, and red flags, she did not mention that discussion when CYS initially interviewed her in March of 2018. *See id.* at 63. Nor did she inform the troopers of that "red flag" discussion when they initially interviewed her in April of 2018. *Id.* at 66. Moreover, there is nothing of record to indicate that anyone in the family told CYS or the PSP that they were suspicious of A.S.'s relationship with Mr. Frost in March or April of 2018.

Instead, grandmother waited to inform the troopers of her concerns for Mr. Frost until her second PSP interview, on June 4, 2018 – *i.e.*, **after** CYS had reported to the PSP that mother and Mr. Frost were co-perpetrators of child abuse. ***See id.*** at 63-64. This was also the first time grandmother told the PSP that Mr. Frost "feels he is a guardian of [A.S.]" ***Id.*** at 64.

Next, she testified that, shortly after the November 2017 discussion with Mr. Frost, she warned mother and boyfriend about Mr. Frost; she said she told them not to allow him near A.S. ***See id.*** at 34. She testified that, as result of her warning, mother "made sure that [A.S.] was away at her dad's house, or she would come over to my house" when Mr. Frost was home. ***Id.*** However, also according to grandmother, A.S. did not go to her dad's house on the weekend in March of 2018, immediately prior to Mr. Frost filing the child-sexual-abuse-hotline report against boyfriend, because A.S. "had really misbehaved in school . . . kicked a trash can [and] tr[ied] to hit a teacher." ***Id.*** at 35.

Next, grandmother related the night that CYS brought A.S. and M.S. to live with her, A.S.'s examinations at Uniontown and Children's Hospital, and her first forensic interview by Ms. Locke. ***See id.*** at 36-41. She also admitted that, at Uniontown Hospital in March 2017, when an emergency-room doctor asked A.S. who sexually assaulted her, A.S. "said [boyfriend] did." ***Id.*** at 59.

Grandmother described boyfriend's relationship with A.S. as "normal." ***Id.*** at 44. However, when asked about A.S.'s relationship with Mr. Frost, she said it had "more of a closeness." ***Id.*** at 45. Mr. Frost "would want to hold

her on his lap [and,] if he had went shopping, different times, [A.S.] may have an extra gift." *Id.*

On cross-examination, Mr. Frost's counsel asked grandmother, whether A.S. gave her "additional information" about Mr. Frost after moving into her home in March 2018. *Id.* at 58. Grandmother answered in the affirmative, and the following exchange occurred:

> Q: Okay, and then you turned that information over to the State Police?
>
> A: Uh-huh.
>
> Q: And one of [the] things she told you about was . . . what happened on the truck trip? Is that one of the things?
>
> A: Yes.
>
> Q: Have you told us everything today what [A.S.] related to you in these conversations that you have had with her?
>
> A: I am sorry?
>
> Q: Have you already told us everything [A.S.] told you about these conversations she has had with you?
>
> A: Not today, not all the content.

*Id.*

On re-direct, the prosecutor said, "When you were asked on cross-examination if you told us everything [A.S.] had told you, since she has been in your custody, and you said, no, not today. What can you tell the jury what [A.S.] has told you since this happened?" *Id.* at 68.

Defense counsel objected on the grounds of hearsay, but the trial court overruled the objection without explanation. *Id.* at 69. Grandmother then testified as follows:

> That [Mr. Frost] had applied lotion to her breasts, her belly, her legs, her genital area, and her butt. He said it would make her skin fell soft. It would smell pretty.
>
> Another instance, she had cried in the beginning, and she said she was torn, it made her heart hurt, because, this was in the very beginning, she didn't want [Mr. Frost] to get in trouble. She knew what he did was wrong, that she should tell, but [Mr. Frost] told her he loved her and she loved him.
>
> And I said, "Honey, I love you." I said, "Pappy John loves you. Daddy loves you. Mommy loves you. But we don't do those things, didn't do the things to you that he did right? That isn't love." I said, "He can't say that he loves you."
>
> She said, "That is what he told me."
>
> \*    \*    \*
>
> [A.S.] had come home from one day with papers about what they learned in school. Not their private body parts being touched, what was acceptable, what wasn't acceptable. Anything under a bathing suit, you know, that [what] a bathing suit covered was not acceptable. She brought the papers home, and I read through them. It said, you know, talk to the child. And I said, "Honey, come here, and I took her back in to the bedroom." And I said, "So you learned about . . . Johnny . . . about not touching his, you know, it was inappropriate."
>
> \*    \*    \*
>
> [A.S.] said that [Mr. Frost] made her touch his privates. She said, "This is what he made me do." And she went with this motion.

Q:    And you are gesturing your hand up and down?

A:    In front of the crotch area.

      And, on another occasion, she said she went to take a bath. She said [Mr. Frost] came in and she said, "I am taking a bath. You are not supposed to be in here."

      [Mr. Frost] asked her jump up on the toilet seat and lay back. She said, "[Mr. Frost] put his up to [my] private area" . . . she called it "his wiener." And [she] said, "Mamaw, there was white stuff, and it was gross, and I didn't like it."

      She said, "When he was on the truck and [took me] out of state, [we] stopped at a truck stop, and there was a place where [we] could take showers."

[DEFENSE COUNSEL]:    Your Honor, I am going to object on the basis of jurisdiction. It is a truck stop.

THE COURT:    Overruled.

A:    That they took a shower together and [Mr. Frost] washed her private area, and he had her take a washcloth with the soap and would wash his . . . private area.

Q:    Did [A.S.] ever say anything about [boyfriend] doing these things?

A:    No.

*Id.* at 69-71

Grandmother also testified that she did not give A.S. instructions on what to say at the forensic interviews, when speaking with the troopers, or at trial. *See id.* at 47.

Next, the trial court ruled A.S. (then ten years of age) was competent to testify. *See* N.T., 10/7/21, at 6-12. After going over her background and family life, A.S. explained that mother and boyfriend had moved into a new

- 31 -

apartment in Uniontown. Mother had born boyfriend's daughter, who was then two years old.

The prosecutor asked A.S. how she knew Mr. Frost. She immediately replied, "He used to be bad stuff to me." *Id.* at 18. Specifically, when mother was still renting the house in Searights, A.S. said she was in the bathtub when Mr. Frost knocked on the door. *See id.*

She said that she replied, "I am in here." *Id.* at 19. A.S. testified that Mr. Frost then entered the bathroom when she "almost had [her] foot in the water." *Id.* A.S. said he told her "to lay on the toilet seat." *Id.* She testified that she complied, and Mr. Frost "unzipped his jeans and put his private part in [her] private part." *Id.*

The prosecutor asked A.S., "does that private part do something else usually?" *Id.* at 20.

She replied, "Uh-huh . . . Yucky tuff comes out." *Id.* But A.S. testified she did not see any "yucky stuff" come out of Mr. Frost. Instead, she said she "can usually feel it." *Id.* Therefore, the prosecutor asked her if she felt the substance when she was laying on the toilet. A.S. said, "Huh-uh." *Id.* at 21.

"Was it another time?" the prosecutor asked. *Id.*

A.S. said, "Yea." *Id.* She then described how Mr. Frost would use a jug to go to the bathroom when she rode with him on his truck. When asked if anything else occurred in the truck, A.S. said, "Huh-uh." *Id.* at 23.

Then the prosecutor asked, "when you were on your truck ride with [Mr. Frost], did you ever stop anywhere?" *Id.*

She replied, "Yea.  Well, actually no."  *Id.*

"No?"  *Id.*

"Huh-uh," A.S. confirmed.  *Id.*

The prosecutor tried again by saying, "you said there was another time where you saw yucky stuff . . . when was that?"  *Id.*

A.S. replied, "When we was [(*sic*)] living in New Salem . . . we had a basement, and there was a washer, and I would sit on top of it when it vibrates."  *Id.*  She initially testified that Mr. Frost would ask to put her on the washing machine.  *See id.*  But she soon revised her testimony to, "I asked him if he could help me get on to the top of the washer."  *Id.* at 24.  Then, "he unzipped his jeans again and had his private parts out . . . ."  *Id.*

The prosecutor asked, "And did you have to touch his private part?"  *Id.*

A.S. answered, "Huh-uh."  *Id.*

"No.  What did you see go into the sink?"  *Id.*

"Yucky stuff."  *Id.*

"Okay, what color was the yucky stuff?"  *Id.*

"White."  *Id.*

"Did he touch you at all anywhere?"  *Id.*

"No."  *Id.*

"Did you have to touch him at all?"  *Id.*

"No."  *Id.*

The prosecutor then tried a different tactic.  She asked A.S., "Did you ever take a shower or bath with [Mr. Frost]?"  *Id.* at 25.

A.S. said, "Well, this place is like a gas station that has showers in there." *Id.* She stated that Mr. Frost "asked [her] to clean his private parts." *Id.* She testified, "There were rags and soap in there. I got the rag wet, put soap on the rag, and started cleaning him." *Id.* at 26.

The trial court then asked A.S. to explain what "private parts" meant to her. *See id.* She pointed to the prosecutor's groin area. *See id.* at 27. She next pointed to her groin. *See id.* The prosecutor asked, "Okay, so, the part you use to go to the bathroom is where [Mr. Frost] inserted his private part?" *Id.* at 28.

A.S. replied, "Uh-huh." *Id.*

"Did that hurt you or did it feel anyway?" *Id.*

"Feel really weird," A.S. said. *Id.*

The prosecutor again asked, "Did it hurt you at all?" *Id.*

"Huh-uh."

The prosecutor attempted to elicit more details regarding the bathroom, but A.S.'s answers were non-responsive. *See id.* at 28-29. She eventually stated that Mr. Frost "said don't tell anybody. But I am telling somebody." *Id.* at 29.

The prosecutor asked, "Did you tell people that [boyfriend] did this to you one time?" *Id.* at 30.

A.S. replied, "Mommy" *Id.* That prompted the following discussion:

Q: You did?

A: Uh-huh.

Q:    Why did you tell her that?

A:    [Mr. Frost] told me to tell somebody, but I am not listening to him anymore.

Q:    So, [Mr. Frost] told you to tell somebody?

A:    Uh-huh.

Q:    To tell somebody what?

A:    [Boyfriend] did this.  But he didn't do this to me.

Q:    And you are not listening to [Mr. Frost] anymore?

A:    Huh-uh.

Q:    [W]hen you were in the showers and washed [Mr. Frost] with the rags on his privates, did you see anything come out of it?

A:    Huh-uh.

Q:    No? Okay.  And did he touch you at all while you were in the shower with him?

A:    Huh-uh.

Q:    Did he wash you?

A:    Huh-uh.  I do clean my own self.  Until [Mr. Frost] started to come into the picture, I always had [mother] clean myself, clean me.  And me and her do play sometimes, when I get done clean, getting clean.

Q:    Okay, do you love [mother]?

A:    Uh-huh.  I love my little sister, and I love [boyfriend].

Q:    Did you love [Mr. Frost] at one time?

A:    No, I don't love him.  I hate him.

*Id.* at 30-31.

Next, A.S. remembered CYS and PSP entering her room on March 27, 2018.  However, she said that she did not recall grandmother and the troopers

taking her to Uniontown Hospital a few hours later, and then to Children's Hospital in Pittsburgh. *See id.* at 33. A.S. remembered the forensic interviewer and "really [did] missed seeing her." *Id.* at 34.

A.S. then identified herself and Ms. Locke in Commonwealth's Ex. 1, in which see repeatedly named [boyfriend] as the offender. The Commonwealth played that video in its entirety. *See id.* at 34-63. Next, A.S. identified herself and Ms. Guzeman in Commonwealth's Ex. 2., wherein, a year after the first interview, she repeatedly named Mr. Frost as her abuser. The Commonwealth played that video in its entirety, as well. *See id.* at 64-102.

At the outset of cross-examination, Mr. Frost's attorney asked A.S., "did you tell the truth to the interviewers in both interviews?" *Id.* at 104.

She said, "Yes." *Id.* She also acknowledged that she had watched the videos previously and gone over them with the prosecutor.

The defense attorney then asked, "And did [the prosecutor] and Trooper Zangla, and your grandmother, sort of help you with getting prepared to testify today. Is that right?" *Id.*

"Uh-huh," A.S. agreed. *Id.*

"Ever since that night the police officers came to you house?" *Id.*

"Yes." *Id.* at 105.

He then asked about the family living in Searights, which prompted A.S. to say, "My mom got me to think to move back there again. That way we can actually have a lot more room. We can play outside. See our friends again. Everything." *Id.*

Next, defense counsel asked whether Mr. Frost bathed A.S. regularly. She replied, "Not really." *Id.* at 106.

A.S. then testified, "When I don't have school, I always go to work with him" in the truck. *Id.* But when asked how often she had ridden in the truck, she immediately contradicted herself, saying, "One time." *Id.*

Next, A.S. confirmed that mother and boyfriend were always home with her in the Searights and New Salem houses, because neither or them worked. *See id.* at 107. "But [Mr. Frost] would go to work in his truck, and he would be gone for days at a time." *Id.* And, by the time Mr. Frost came home, on Fridays, she said, "I always go to my dad's." *Id.* at 108.

Defense counsel eventually attempted to establish the timeline and locations of the alleged incidents, but A.S.'s answers lacked any specificity. She struggled to differentiate between events at the house in Searights and New Salem.

He asked, "Did anybody tell you that [Mr. Frost] did these things to you?" *Id.* at 117.

She said, "Mommy." *Id.* A.S. added that mother "told me I might have to have court like this." *Id.*

"Did she tell you [Mr. Frost] did things to you?" *Id.*

A.S. answered, "Yes." *Id.*

"Did she tell you [Mr. Frost] did things to you in the bathroom?" *Id.* at 118.

"Yes." *Id.*

"Did she tell you [Mr. Frost] took you in his truck and took you in a gas station, and did things to you?" ***Id.***

A.S. now balked. "I don't know, um, um, about that one." ***Id.***

Defense counsel pressed on: "Did she tell you [Mr. Frost] did these things to you after the police [and CYS] came to your house that night?" ***Id.***

A.S. said, "Yes. Because [Mr. Frost] called them." ***Id.***

"Did your [mother] tell you, '[Boyfriend] is a good guy; he didn't do anything?'" ***Id.***

A.S. again answered, "Yes."

Defense counsel then asked, "Does [grandmother] say the same thing about [boyfriend;] 'He is a good guy, and he didn't do anything to you?" ***Id.***

"Yes." ***Id.***

After getting A.S. to acknowledge that she remembered the first forensic interview and the video of that the courtroom had just watched, defense counsel asked her, "Do you remember telling [Ms. Locke] that [boyfriend] did bad things to you?" ***Id.*** at 120.

A.S. said, "No." ***Id.***

"Okay. Did you tell [Ms. Locke] that [Mr. Frost] did things to you?" ***Id.***

"Yes," A.S. said in clear contradiction of the indisputable video evidence in Commonwealth's Ex. 1, which depicted her repeatedly telling Ms. Locke that ***boyfriend*** was the abuser. ***Id.***

"If you can remember, did you ever tell anybody [boyfriend] did anything to you?" ***Id.***

Contradicting the video evidence yet again, A.S. said, "Huh-uh." *Id.*

Next, defense counsel asked, "did you ever tell Trooper [Clem-]Johnston or any of the police that you have been talking to that [boyfriend] did bad things to you?" *Id.*

She said, "Yes." *Id.*

"You did tell them that?" *Id.*

Then she changed her mind and said, "No, actually." *Id.*

When defense counsel showed A.S. a figure of a nude male, he asked her:

Q: Did you tell one of the police officers that that looked like [boyfriend]?

A: Uh-huh.

Q: The private parts?

A: Yea.

Q: Okay. And, when did you see [boyfriend's] private parts that you can say that looks like [boyfriend]? Can you tell . . . the jury how you knew that looked like [boyfriend's] private parts?

A: (no answer).

Q: [A.S.], you are not going to get in trouble for whatever you say here. So, they just want to be told the truth. Okay.

A: I don't remember.

Q: You can't remember how you told the police officer you recognized on this picture how the private parts of a boy reminded you of [boyfriend] or looked like [boyfriend]?

A: Looked like [boyfriend].

Q:      The private parts looked like [boyfriend]?

A:      Yea.

Q:      Have you ever seen [boyfriend's] private parts?

A:      No.

Q:      Do you know why you told the trooper . . . those private parts looked like [boyfriend]?

A:      No.

*Id.* at 122-124.

Furthermore, A.S. acknowledged that she "really" wants to go back to living with mother and boyfriend. *See id.* at 125-26. And, in her mind, Mr. Frost is the reason that she cannot live with them. *See id.* at 126.

On redirect, the prosecutor asked if mother told her what to say in court. A.S. said, "No." *Id.* at 127.

"Did [grandmother] tell you what to say today?" *Id.*

A.S. replied, "She said just to do great." *Id.* The prosecutor asked what that meant, and A.S. said, "Just keep [Mr. Frost] in jail and . . . I will never have to do this anymore." *Id.*

The prosecutor then attempted to clarify, "I just want to make sure that you are not just telling us something that didn't happen, so this doesn't have to happen again. The things you said today, did they really happen?" *Id.* at 128.

A.S. answered in the negative: "Huh-uh." *Id.*

"They didn't happen? What didn't happen that you told us today?" *Id.*

She replied, "[Grandmother] just wants me to do great . . . My dad, grammy, [grandmother], and [mother] . . . ."

"Did you tell lies today to do great?" *Id.* at 129.

Despite indisputable video evidence to the contrary, A.S. said, "No, I never tell lies." *Id.*

On recross-examination, defense counsel returned to the first forensic interview and said, "So, you told [Ms. Locke] about [boyfriend]. Why did you all of a sudden say . . . Why did you later say it was [Mr. Frost]?" *Id.* at 133.

A.S. answered, "[Mother] actually told me it wasn't [boyfriend]. It was [Mr. Frost.]" *Id.*

The prosecution then attempted to rehabilitate A.S. on re-redirect. The Commonwealth asked her why she originally told Ms. Locke that Mr. Frost told her boyfriend abused her. *See id.* at 134. A.S. immediately repeated that "[Mother] told me it wasn't [boyfriend]. It was [Mr. Frost]." *Id.* at 134.

"Did you talk to [mother] before you went to see [Ms. Locke]?" *Id.*

"Yes." *Id.*

Q: Did you see [boyfriend] come into your room that night?

A: Huh-uh. I always sleep with my eyes closed at night.

Q: You talked about [Mr. Frost] with a camera. Do you remember that in the video?

A: No.

Q: Do you ever remember seeing [Mr. Frost] video you?

A: No.

Q:     Did [Mr. Frost] ever tell you he videoed you?

A:     Yes.

Q:     Did [Mr. Frost] tell you [boyfriend] did this to you?

A:     Yes.

Q:     And you did see [Mr. Frost] in your room that night, correct?

A:     No.

Q:     You didn't see him in there?

A:     No.

Q:     Did you see [boyfriend] in your room that night?

A:     No.

*Id.* at 134-35.  That concluded A.S.'s testimony.

Next, the Commonwealth called the forensic nurse, a serologist from the PSP crime lab, and a DNA scientist.  *Id.* at 138-82.  They all testified there was no physical evidence of anyone sexually assaulting A.S., much less a sample of male DNA to identify the perpetrator.  *See id.*

Thereafter, Paige Winters testified to the November 30, 2018 therapy session, wherein A.S. told her, "Well, [boyfriend] didn't do it, [Mr. Frost] did." *Id.* at 189.  Ms. Winters read her child-abuse report to the jury.  *See id.* at 196-97.

On cross-examination, Ms. Winters said she called grandmother while preparing the report to give her a heads-up.  According to Ms. Winters, A.S.'s new allegations against Mr. Frost "was news" to grandmother.  *Id.* at 197. Moreover, in contradiction to grandmother's testimony that she first suspected

Mr. Frost following his alleged request for a pregnancy test the previous November, Ms. Winter testified that grandmother "didn't say anything [that] she suspected [Mr. Frost]." *Id.* at 198.

Next, Corporal Mrosko and Ms. Locke both testified to their roles in the early stages of the case and the investigation into A.S.'s original allegations against boyfriend. *See id.* at 205-255.

Then, the Commonwealth called boyfriend to the stand. He testified that he left A.S.'s parenting to mother and father. When asked to describe A.S. and Mr. Frost's relationship, he said, "Too close." *Id.* at 261. According to boyfriend, even thought he had just previously testified that A.S. "is always with her dad on the weekends," he said Mr. Frost "was constantly around [A.S.;] too much to me anyway . . . Always around her." *Id.* at 260, 262. Despite holding that opinion at trial, when he "talked to the police initially" in March of 2018, boyfriend "didn't say anything about [Mr. Frost] to them, or that [he] was concerned about him . . . ." *Id.* at 281.

When the prosecutor asked boyfriend if he ever spends time alone with A.S., he said, "No." *Id.* at 262. Boyfriend said that anytime A.S. and he were in the house that mother was there with them. He denied molesting A.S. and denied entering her room at night. *See id.* at 264.

On cross-examination, he also denied that A.S. ever helped him do laundry in the basement or that she ever asked him to put her up on the washer or dryer. *See id.* at 276. He also testified that there was only one

weekend that Mr. Frost and A.S. were home together, *i.e.*, "before the CYS [thing] happened." *Id.* at 278.

Then, mother testified. After repeating the family's history and living situation, she said that A.S. and Mr. Frost's relationship was:

> very different . . . A lot more close and intimate than it should have ever have been between a man and a child. More intimate than . . . it never should have happened.
>
> In one instance, [Mr. Frost] started rubbing her butt after Christmas. This was . . . the Christmas before CYS was called. And he was rubbing her butt and saying how cute her pants looked on her.

*Id.* at 291. Otherwise, mother never saw Mr. Frost "touch [A.S.] in a sexual manner." *Id.* at 307.

Mother also said that Mr. Frost regularly referred to A.S. as "Tinkerbutt" and that he gave her more gifts than he gave to M.S. *Id.* at 291. She testified to allowing Mr. Frost to bathe A.S. when she was doing other chores, such as cooking dinner. *See id.* at 292. She never observed these baths. *See id.* at 307. "A couple of times," A.S. even asked Mr. Frost to bathe her, and mother repeatedly testified that she had "no concern" about Mr. Frost bathing A.S., "because there was [(*sic*)] other people in the household." *Id.* at 308. In addition, she never testified that grandmother warned her in 2017 that Mr. Frost requested a pregnancy test for A.S. or that he should not be allowed near the girl.

Next, mother discussed the out-of-state truck trip. According to her, Mr. Frost "begged" for A.S. to spend the night on his tractor trailer. *Id.* at

292. When she objected to his request, Mr. Frost offered to pay for gas and dinner if mother would bring A.S. to meet him on his truck in Bruceton Mills, West Virginia. **See id.** Mother confirmed, however, that this road trip was "to another state." **Id.** After returning from the trip, A.S. acted neither concerned nor timid around Mr. Frost, and she never expressed any problems with Mr. Frost to mother. **See id.** at 294.

Mother denied telling A.S. what to say at the forensic interviews or at trial. **See id.** at 295. She similarly denied getting into a fight with boyfriend when they were drunk. **See id.** at 313.

She stated that, the weekend before CYS and PSP came to the home, both A.S. and Mr. Frost stayed in the house. **See id.** at 295. She described the events of that weekend as follows:

> [A.S.] had gotten into trouble at school, and her punishment was that she could not go up and stay with her father that weekend . . . . Because she looks very highly upon her [father]. [A.S.'s] father and her have a very, very strong relationship.

> \*     \*     \*

> [During that weekend,] I hadn't went [(*sic*)] to sleep right away, and I had observed [Mr. Frost] come from his bedroom, across the steps, up past the bathroom, up past my bedroom, and continue on the [A.S.'s] room. And I waited a couple minutes, and I said, "What are you doing?"

> He came out. He said, "I am just checking on her." And he went back into his room.

> I hadn't went [(*sic*)] to sleep. It was between a half hour and an hour later. He had come back through, and I asked him again, "What are you doing?"

And he said, "Mom is on the ball tonight."

*Id.* at 296-97. Despite this testimony, there is nothing of record to indicate that mother ever told CYS or the police the above story, even though they took her children away from her three nights later. Additionally, she and boyfriend continued to live with Mr. Frost in the New Salem house for "a few months afterwards." *Id.* at 298.

Finally, the Commonwealth called Trooper Zangla and Sergeant Clem-Johnston to explain their investigative efforts after Corporal Mrosko turned over the case to them. During Trooper Zangla's testimony, the Commonwealth played a portion of the audio recording of her post-arrest interview of Mr. Frost. He made no incriminating statements. ***See*** Commonwealth's Ex. 15.

Relevant to this appeal, when the prosecutor asked Sergeant Clem-Johnston to recount what A.S. said during her June 19, 2018 interview by the PSP, the following exchange occurred:

> Q: What else did you discuss with [A.S.]?
>
> A: I asked her, when they were in the shower [at the out-of-state truck stop], if her clothes and . . . .
>
> [DEFENSE ATTORNEY]: I am going to object on the basis of hearsay at this point, Your Honor.
>
> [PROSECUTOR]: Your Honor, I filed a Notice, under 9758, that was part of this testimony from Sergeant Clem.
>
> THE COURT: If it is to the child, although I would sustain the objection as to anyone else. The synopsis is, everyone else's testimony as they had testified in Court.

N.T., 10/9/21, at 121-22.  The trial court permitted the hearsay.

Sergeant Clem-Johnston then read from her notes of the interview.  She discussed the truck-stop-shower incident, that A.S. said she never saw Mr. Frost's penis in the shower and that boyfriend stuck his penis in her vagina while Mr. Frost videoed it.  *See id.* at 122-23.  Sergeant Clem-Johnston further testified that A.S. said she neither saw nor felt boyfriend's penis enter her, that Mr. Frost put lotion on himself and her, that she and Mr. Frost have no secrets, and that Mr. Frost will cry if she tells people that boyfriend put his penis inside of her.  *See id.* at 123.

The Commonwealth rested.  Mr. Frost moved for judgment of acquittal on all charges, and the trial court denied the motion as to all counts, but it went on to say:

> on the truck issue, as there has been no testimony or unreliable testimony, as to the whereabouts of the alleged incident in the truck. . . . it is not part of the Informations as charged.  However, the court could mold the charges to include that testimony, since the general charges have been made.  The court will not elect to do that, as the court believes that the court cannot establish jurisdiction to proceed with any incidents that allegedly have occurred in the truck.

*Id.* at 140 (excess capitalization omitted).  Thus, the court dismissed the allegations regarding the truck-stop shower in another state for lack of jurisdiction.

Lastly, in light of the trial court's pretrial denial of his motion *in limine*, Mr. Frost decided not to testify.  He thereby prevented the admission of his

prior conviction in South Carolina on rebuttal but also found himself forced to forgo putting on a defense's case-in-chief.

The jury convicted Mr. Frost on all 14 counts, and the court sentenced him to 25 to 50 years' incarceration. Mr. Frost filed post-sentence motions, which the trial court denied, and this timely appeal followed.

The Commonwealth elected not to file an appellee brief in this Court.

### III. Analysis

Mr. Frost raises five appellate issues, but we limit our review to the two that necessitate appellate relief.[9] Those issues are as follows:

---

[9] One of Mr. Frost's five issues challenges the sufficiency of the evidence. In **Commonwealth v. Brown**, 52 A.3d 320, 323 (Pa. Super. 2012), this Court said, because "a successful sufficiency-of-the-evidence challenge warrants discharge rather than a new trial . . . we analyze Appellant's [sufficiency] issue at the onset." Thus, we would normally begin our review with Mr. Frost's sufficiency claim.

However, Mr. Frost makes no meaningful argument in support of this claim. His entire argument regarding sufficiency is one sentence:

> [Mr. Frost] respectfully submits that the Commonwealth failed to present sufficient evidence to prove beyond a reasonable doubt that [he] sexually abused [A.S.] at any time for the same reasons set forth in [his] argument concerning the weight of the evidence.

Frost's Brief at 33. This statement shows a lack of understanding of the differences between a sufficiency issue and a weight-of-the-evidence issue and their divergent scope and standard of review on appeal. The former is a *de novo* review, while the latter is a review for an abuse of discretion. **Compare, e.g.**, **Commonwealth v. Johnson**, 236 A.3d 1141, 1152 (Pa. Super. 2020) **and Commonwealth v. Champney**, 832 A.2d 403, 408 (Pa. 2003), *cert. denied*, 542 U.S. 939 (2004).
*(Footnote Continued Next Page)*

1.      Whether the trial court erred in denying [Mr. Frost's] Motion *in Limine* to Preclude Evidence of [His] Prior Conviction in South Carolina?

2.      Whether the trial court erred in permitting the Commonwealth to introduce hearsay evidence in violation of the Pennsylvania Rules of Evidence and 42 Pa.C.S.A. § 5985.1(b)?

Frost's Brief at 8-9.

Our scope and standard of review is identical for both issues. Because they both involve admissibility of evidence, our standard of review is abuse of discretion. ***See, e.g.***, ***Commonwealth v. Belani***, 101 A.3d 1156, 1160 (Pa. Super. 2014). An "appellate court should not find that a trial court abused its discretion merely because the appellate court disagrees with the trial court's conclusion." ***Commonwealth v. Gill***, 206 A.3d 459, 467 (Pa. 2019). Instead of "substituting [our] own judgment for that of the trial court," an abuse-of-discretion review requires an "examining [of] the trial court's conclusion and rationale . . . ." ***Id.*** at 467. Discretion is abused if "the trial court has reached

_____

Moreover, a "true weight-of-the-evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed." ***Commonwealth v. Miller***, 172 A.3d 632, 643 (Pa. Super. 2017). Therefore, Mr. Frost incorporated an implied concession that the Commonwealth presented legally sufficient evidence into his sufficiency argument. Also, an appellant must identify the elements of each that were missing at trial, such that he was entitled to judgment of acquittal. Mr. Frost did not do this. In fact, he does not even identify which crimes for which he believes the Commonwealth produced insufficient evidence. Accordingly, his sufficiency argument is woefully underdeveloped, and we dismiss it as waived. ***See Commonwealth v. Hardy***, 918 A.2d 766, 771 (Pa. Super. 2007); ***see also*** Pa.R.A.P. 2119(a), (b), (c).

a conclusion which [(1)] overrides or misapplies the law; [(2)] is manifestly unreasonable; or [(3) is] the result of partiality, prejudice, bias or ill-will." ***Id.*** at 466–67 (some punctuation omitted).

## A.    Mr. Frost's 2001 Guilty Plea

In his first evidentiary issue, Mr. Frost argues that the trial court abused its discretion by denying his motion *in limine*, because it "misinterpreted [Pa.R.E.] 404(b) by ruling that the Commonwealth would be entitled to introduce into evidence records pertaining to [his] prior conviction . . . for the crime of Lewd Act Upon a Child in South Carolina." Frost's Brief at 23. He contends that the identity exception to the Rule, upon which the trial court relied to deny the motion *in limine*, is legally inapplicable to this case. ***See id.*** at 24. Thus, he contends the trial court misapplied Pa.R.E. 404(b).

Moreover, relying upon ***Commonwealth v. Ardinger***, 839 A.2d 1143 (Pa. Super. 2003), Mr. Frost contends the trial court's decision is manifestly unreasonable and against the precedent of this Court, because the trial court failed to perform any probative-value-versus-prejudicial-effect analysis. He asserts that, due to the highly prejudicial nature of a prior conviction for inappropriately touching a young girl, the trial court presented him with a Hobbesian Choice – either forfeit his constitutional right to testify in his own defense or face the possibility of the jury being inflamed upon learning of the prior conviction.

As a general rule, "Evidence of any other crime . . . is not admissible to prove [his] character . . . to show that on a particular occasion [he] acted in

accordance with the character." Pa.R.E. 404(b)(1). This prohibition dates back centuries.

"It is a general rule that a distinct crime, unconnected with that [alleged] in the indictment, cannot be given in evidence against a prisoner." ***Shaffner v. Commonwealth***, 72 Pa. 60, 65 (1872). "It is not proper to raise a presumption of guilt, on the ground, that having committed one crime, the depravity it exhibits makes it likely he would commit another." ***Id.*** "To make one criminal act evidence of another, a connection between them must have existed in the mind of the actor, linking them together for some purpose he intended to accomplish; or it must be necessary to identify the person of the actor, by a connection which shows that he who committed the one must have done the other." ***Id.***

The Supreme Court eventually codified ***Shaffner*** as follows: Evidence of another crime, wrong, or act "may be admissible [to prove] motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2). "In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." ***Id.***

The trial court ruled Mr. Frost's 2001 conviction for Lewd Act Upon a Child was admissible for the Commonwealth to prove his identity, if he denied the accusations. The trial court justified its decision on two grounds. First, it found the prior crime substantially similar to allegations in this case, because (1) the victim in South Carolina was a seven-year-old girl and A.S. was a six-

year-old girl at the time of these alleged events and (2) the South Carolina record indicated that Mr. Frost fondled the seven-year-old's vaginal area. *See* N.T., 10/6/21, at 14-15. Second, the trial court determined that a 17-year gap between offenses was not too great for a prior sexual offense, under "***Commonwealth v. Rodriquez*** and also ***Commonwealth v. Shribal***." *Id.* at 15-16.

However, the trial court cited neither of those cases when discussing this issue in its Rule 1925(a) Opinion. There, the trial court opined:

> Proof of identity is one of the recognized, legitimate exceptions to the prohibition against "other acts" evidence. ***See*** Pa. R.E. 404(b)(2). The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature. ***Commonwealth v. Ross***, 57 A.3d 85 (Pa. Super. 2012); ***Commonwealth v. Shively***, 424 A.2d 1257, 1259 (Pa. 1981). Admitting evidence of another crime to prove identity as to the charged crime requires a high correlation in the details of the crimes. ***Id.***
>
> The nature of the crime and the evidence presented puts the identity of the perpetrator at issue. [Mr. Frost's] prior conviction is unusual and distinctive, a trademark of sorts, by his touching the vaginal area of another minor, aged six or seven-year-old, female child. N.T. 10/6/2021, at 11.
>
> This evidence shows identity—a purpose permitted under Pa.R.E. 404(b)(3)—through selection of a particular class of victim and use of idiosyncratic methods to carry out the crimes. ***Commonwealth v. Weakley***, 972 A.2d 1182, 1188 (Pa. Super. 2009). The Court narrowed its ruling so that evidence of [Mr. Frost's] prior conviction would only be admissible in rebuttal should [he] testify that he did not perform these acts. The probative value of this strong identity evidence, moreover, outweighs its presumed potential for prejudice.

Trial Court Opinion, 5/11/22, at 14-15.

The trial court's rationale is manifestly unreasonable, because judicial analysis is nonexistent. The opinion is a string of conclusory statements with no tie to the evidence of record or to the allegations that A.S. made against Mr. Frost in this case. Nothing in the trial court's discussion shows that "a connection between" the events in South Carolina in 2000 and those in Fayette County in 2017-18, which "must have existed in the mind of [Mr. Frost], linking them together for some purpose he intended to accomplish" or that "he who committed the one must have done the other." **Shaffner**, 72 Pa. at 65. Thus, although correctly framing the law, the trial court ignores and misapplies it.

At the outset, the trial court correctly stated that, in order for a prior conviction to be admissible to prove a defendant's identity, the "pattern and characteristics of the crimes must be so unusual and distinctive as to be like a **signature.**" **Id.** at 14 (citing **Commonwealth v. Ross**, 57 A.3d 85 (Pa. Super. 2012) and **Commonwealth v. Shively**, 424 A.2d 1257, 1259 (Pa. 1981)) (emphasis added). But the trial court never explained how the record from South Carolina showed any distinctiveness from any other child-molestation case, so as to create a "signature" by Mr. Frost.

"In order for other crimes evidence to be admissible under this exception, a comparison of the crimes must establish a **logical** connection between them." **Commonwealth v. Bronshtein**, 547 Pa. 460, 478, 691 A.2d 907, 916 (1997) (emphasis added). Here, the trial court fails to make a

logical connection between the South Carolina conviction and the allegations in the present case.

The only facts from the South Carolina record are (1) Mr. Frost "fondled" the vaginal area of the victim and (2) the victim was a seven-year-old girl. No rational mind could possibly conclude that those two facts established a "signature" of the crime, because those facts are, as defense counsel argued below, the "bare bones" elements of the South Carolina offense. To commit a Lewd Act Upon a Child requires (1) a lewd act and (2) a child.

Under the trial court's rationale, for instance, a prior conviction for DUI would be admissible in all future DUI cases to prove a defendant's identity, because the prior record would certainly include the following facts: (1) the defendant operated a vehicle (2) while legally intoxicated. Such base-level elements do not make a criminal signature; they make the crime. Indeed, if the trial court's reasoning were to stand and mere elements from a prior conviction made the prior conviction admissible under Rule 404(b)(2) to prove identity, the exception would swallow the general rule. All prior convictions would be admissible to prove the defendant's identity.

Moreover, the bare bones allegations in the South Carolina record do not match the offenses that A.S. claimed Mr. Frost committed. A.S. never accused Mr. Frost of "fondling" her vagina. Indeed, when the troopers interviewed her, she stated that Mr. Frost "'cleaned my whole body, except this part,' and pointed to the vaginal area on the drawing." N.T., 10/9/21, at 121. Instead, A.S. claimed Mr. Frost put his penis inside her vagina and that

he would have her wash and rub his penis. Thus, any "fondling" in this case was allegedly performed by A.S. upon Mr. Frost, not the other way around.

In short, the lewd act, briefly discussed in South Carolina's grand jury indictment, does not parallel the accusations at bar. The trial court's ruling that the prior conviction established a signature of the crime finds no support in the record.

Additionally, regarding temporal connection between Mr. Frost's 2001 conviction (for an event that occurred in 2000) and the allegations in this case (November 2017 and March 2018), the trial court concluded that a gap of 17 years was not so remote as to bar the evidence of the prior conviction. From the bench, the trial court said, "Evidence of similar acts has also been admitted, even though quite remote from the charged offense." N.T., 10/6/21, at 15. However, it failed to elaborate on this point in the 1925(a) Opinion.

"The probative value of the degree of similarity of the crimes is inversely proportional to the time period separating the crimes." **Bronshtein**, 691 A.2d at 916. In **Bronshtein**, the two murders were committed five weeks apart. Thus, the probative value was very high, because they were likely part of the same crime spree by the same defendant. Both murders involved the (1) robbery of jewelry stores, (2) owned by persons of Russian-Jewish dissent, where (3) the victims were both shot in the head at close range. Thus, in light of the high similarity of the crimes and the very short time frame between the two murders, the Supreme Court of Pennsylvania held that the trial court did

not abuse its discretion by admitting the prior-crime evidence to prove the murder's identity.

Here, by contrast, there were 17 to 18 years between the crime in South Carolina and the allegations in this case. Moreover, there was no logical connection and a lack of similar details between those temporally and geographically distance events to establish a "signature" of the crimes to identify Mr. Frost as the perpetrator of the current, alleged abuse.

Lastly, we agree with Mr. Frost that the trial court failed to consider whether the probative value of the prior conviction outweighed its prejudicial effect. *See* N.T., 10/6/21, at 14-16. Similarly, in its 1925(a) Opinion, the trial court offered no analysis on this part of the test. The court summarily stated, "The probative value of this strong identity evidence, moreover, outweighs its presumed potential for prejudice." Trial Court Opinion, 5/11/22, at 15. This conclusory statement is unworthy of appellate deference, because the trial court provided this Court with no logic or rationale to review. Hence, we conclude the trial court's unsubstantiated conclusion that probative value of the prior conviction outweighed its prejudicial effect is arbitrary, capricious, and (as such) manifestly unreasonable.

Therefore, the trial court abused its discretion when it denied Mr. Frost's motion *in limine* to preclude any reference by the Commonwealth to his South Carolina conviction. Rule of Evidence 404(b)(1) compelled the trial court to grant his motion, and the trial court articulated no rational basis as to why Rule of Evidence 404(b)(2) should apply in this case.

## 2. Sergeant Clem-Johnston's Hearsay Testimony

For his second evidentiary issue, Mr. Frost challenges the trial court's admission of hearsay testimony from Sergeant Clem-Johnston as to what A.S. allegedly told her and Trooper Zangla in A.S.'s June 19, 2018 interview. **See** Frost's Brief at 26-28. He indicates the Commonwealth failed to provide him with the "Notice of Intent to Offer Out-of-Court Statements Made by Child Witness as required by 42 Pa.C.S.A. §§ 5985.1 and/or 5986." **Id.** at 27.

Under Pa.R.E. 802, hearsay testimony is not permitted in court "except as provided by these rules, by other rules prescribed by the Pennsylvania Supreme Court, or by statute." 42 Pa.C.S.A. §§ 5985.1 and 5986 codify this Commonwealth's tender-years exception to Rule 802.

"The tender-years exception allows for the admission of a child's out-of-court statement due to the fragile nature of young victims of sexual abuse." **Commonwealth v. Fink**, 791 A.2d 1235, 1248 (Pa. Super. 2002). Even so, a child's out-of-court statement "**shall not** be received into evidence unless the proponent of the statement notifies the adverse party of [its] intention to offer the statement . . . ." 42 Pa.C.S.A. § 5985.1(b).

This Court has long held that the tender-year statutes, circumscribing a defendant's confrontation rights, must be followed scrupulously. Explaining the statutory scheme in detail, we opined that the tender-years-hearsay act:

> mandates heightened discovery. It recognizes that child witnesses pose difficult problems for the parties, the court and the jury. A child may not be able to tell his story in court because of emotional trauma associated with the crime. The law, therefore, makes a special accommodation

- 57 -

to enable the prosecution to prove its case in such circumstances. This accommodation in turn poses unique challenges for the defendant who must defend against a charge where the victim himself does not tell the jury what happened, but others to whom the victim talked become his surrogate in court. In permitting such hearsay, the legislature has determined that the defendant is entitled to a type of notice that is direct and specific in order to provide a meaningful opportunity to challenge the hearsay. For example, the defendant may wish to offer expert psychological evidence about the failure of children of certain ages to distinguish truth from fantasy or the defendant may have specific evidence relating to the victim's reliability. It is for these reasons that the notice provisions are strict and must be strictly observed.

The Act clearly states that in the event notice is not given, the "statement ***shall not*** be received into evidence." § 5985.1(b) (emphasis supplied). Since it is only by the authority of the statute that this otherwise inadmissible evidence is deemed admissible, a party's failure to comply with the statute's provisions must be met with the result dictated by the statute. Here, the legislature decided that a lack of notice negates the benefit § 5985.1 provides to the Commonwealth's case. We have no authority to alter that statutory scheme.

***Commonwealth v. Crossley***, 711 A.2d 1025, 1028–29 (Pa. Super. 1998) (footnotes omitted).

The trial court admits it violated this statute's clear and unambiguous prohibition against hearsay statements in the absence of notice. In making its ruling, the trial court relied upon an erroneous representation from the Commonwealth that "it had filed a notice that that permitted it to offer out-of-court statements of the minor child." Trial Court Opinion, 5/11/22, at 21; ***see also*** Commonwealth's February 7, 2020 Notice of Intention to Offer Out-of-Court Statements Made by Child Witness (listing only the hearsay

statements that A.S. made to Ms. Locke and Ms. Guzeman during her forensic interviews); Commonwealth's August 28, 2020 Notice of Intention to Offer Out-of-Court Statement Made by Child Witness (listing only the hearsay statements that A.S. made to her therapist, Ms. Winters).

As the trial court correctly acknowledged, it overrode the law on evidence. Hence, it abused its discretion by permitting Sergeant Clem-Johnston to testify to what A.S. said in her June 19, 2018 interview.

Having determined that two of Mr. Frost's evidentiary issues are meritorious, we must decide whether to conduct a harmless-error review. "Under the rule in the seminal case of **Commonwealth v. Story**, 476 Pa. 391, 406, 383 A.2d 155, 162 (1978), we will only consider an error to be harmless when the Commonwealth is able to establish beyond a reasonable doubt that the error was harmless." **Commonwealth v. Mayhue**, 639 A.2d 421, 433 (Pa. 1994). Here, as previously mentioned, the Commonwealth did not file a brief; it therefore made no attempt to meet that burden.

Where, as here, the Commonwealth does not attempt to carry its burden of proving harmless error beyond a reasonable doubt, the Supreme Court of Pennsylvania has held that this Court may – but need not – conduct a harmless-error review, *sua sponte*, grounded in the right-for-any-reason doctrine. **See Commonwealth v. Hamlett**, 234 A.3d 486 (Pa. 2020). The decision to perform a *sua sponte* review is a matter resting in the discretion of the appellate court. However, the **Hamlett** Court made clear that, "the right-for-any-reason doctrine should not be routinely or liberally employed to

impose a high barrier to reversal of criminal convictions. In this respect, we note that various federal courts have suggested that *sua sponte* review is extraordinary and should be disfavored . . . ." ***Id.*** at 493.

In a case such as this, where the Commonwealth elected not to file an appellee brief to defend the trial court's rulings from appellate attack, we see little reason or need to conduct an "extraordinary" and "disfavored," *sua sponte*, review on the prosecution's behalf. This is especially truly here, given that one of the erroneous evidentiary rulings deprived Mr. Frost of his constitutional right to take the stand in his own defense and tell the jury his version of events, which A.S. related in, at best, a conflicting and self-contradicting manner.

Accordingly, Mr. Frost's two evidentiary issues warrant relief.[10]

Judgment of sentence vacated; convictions vacated. Order denying post-sentence relief reversed. Order denying Mr. Frost's motion *in limine* reversed. Case remanded for a new trial.

Jurisdiction relinquished.

---

[10] We dismiss his remaining appellate issues as moot. We also note that, because the trial court held that Pennsylvania lacked jurisdiction over any alleged incidents in Mr. Frost's truck and truck-stop showers, on retrial any testimony or evidence regarding those events will be irrelevant. ***See*** N.T., 10/9/21, at 140.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/30/2023